**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WADE MUNDY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MEGAN HOLDINGS LIMITED, DARREN HOO AKA HOO WEI SERN, NG KAI TIE, D. BORAL CAPITAL LLC, and WWC, P.C.,<br><br>Defendants. | **Case No: 1:26-cv-05754**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Wade Mundy ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning himself, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Megan Holdings Limited, ("Megan" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Megan; and (c) review of other publicly available information concerning Megan and similar entities.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of all persons and/or entities that purchased or otherwise acquired Megan securities between September 26, 2025, and March 25, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against Megan, its executives Darren Hoo AKA Hoo Wei Sern, Kai Tie Ng, WWC, P.C., and D. Boral Capital LLC, (the "Defendants"), under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Further, this class action also asserts claims on behalf of all persons and/or entities that purchased or otherwise acquired Megan securities pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Offering Documents") in connection with Megan's initial public offering ("IPO"), which occurred on or around September 26, 2025, pursuant to the Securities Act of 1933 (the "Securities Act").

3.    The Company conducts its purported business operations in Malaysia and purportedly is principally engaged in the development, construction, and maintenance of aquaculture farms and related works, as well as aiding customers with the design and development of new farms. The Company has two subsidiaries: Megan Mezanin Sdn Bhd ("MMSB"), which is

1

a wholly-owned subsidiary principally engaged in development, construction and maintenance of agriculture and agriculture farms in Malaysia, and Megan Technologies Sdn Bhd ("MTSB"), which is an indirect subsidiary of Megan and an 80% direct subsidiary of MMSB, involved in consultancy and management of projects for process engineering and industrial systems, and supply of robotics and automation equipment.

4.    The Company is a holding company incorporated in the Cayman Islands. Megan's principal executive offices are located at B-01-07, Gateway Corporate Suites, Gateway Kiaramas, No.1, Jalan Desa Kiara, 50480 Mont Kiara, Kuala Lumpur, Malaysia. The Company completed its initial public offering on September 29, 2025, selling 1.25M ordinary shares at an offering price of $4.00 per share, raising $5M in gross proceeds (the "IPO").

5.    This case arises from the sudden collapse of Megan's stock price on March 26, 2026, due to a fraudulent market manipulation scheme that caused the Company's stock price to skyrocket more than 400% from $1.23 on February 25, 2026, to trade as high $5.18 per share intraday on March 25, 2026, despite no fundamental news to justify such a spike in the Company's stock price. Investigation and public reports have revealed that Megan was a vehicle utilized in a market manipulation and "pump-and-dump" promotional scheme. Impersonators acting as financial advisors touted Megan in online forums, chat groups, and social media posts with baseless claims to create a buying frenzy amongst retail investors.

6.    On March 26, 2026, the Company's market value collapsed 93.4% to close at $0.28 per share, down from $4.24 per share at close (and $5.18 per share at intraday high) on March 25, 2026 and the stock has not recovered and continues to trade well below $0.28.

7.    Throughout the Class Period, the Company, its executives (identified below) and its auditor (identified below) made materially false and/or misleading statements and failed to

disclose material adverse facts about the Company's business, operations, and the true nature of the trading activity in the securities. The Offering Documents (defined below) contained material misstatements and omissions of fact. Specifically, Defendants failed to disclose to investors that: (1) Megan was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) Megan's public statements and risk disclosures omitted any mention of the realized risk of fraudulent trading or market manipulation used to drive the Company's stock price; (3) as a result, Megan securities were at unique risk of a sustained suspension in trading by NASDAQ and severe volatility-induced decline; (4) the sole underwriter on the IPO, DBC (defined below), had conducted numerous microcap IPOs that suffered volatility-induced declines resulting from market manipulation schemes; (5) the Company suffered from material weaknesses in its internal accounting and financial reporting controls; and (6) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

8.      All Defendants participated in a common scheme or device to defraud investors in permitting the Company to go public and thus, allowing the market manipulation scheme to occur.

## II.    JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5) and Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa) and Section 22 of the Securities Act (15 U.S.C. § 77v).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) and Section 22 of the Securities Act (15 U.S.C. § 77v). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. The Company's agent of service and authorized U.S. Representative, Cogency Global Inc., as well as Defendant DBC (defined below) are located in this District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and/or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

13.     Plaintiff Wade Mundy, as set forth in the accompanying certification, incorporated by reference herein, purchased Megan securities during the Class Period, the purchases were pursuant to or traceable to the IPO, and suffered substantial damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Megan is a Cayman Islands incorporated holding company with principal executive offices in Malaysia. The Company's common stock trades on the NASDAQ under the symbol "MGN" during the Class Period.

15.     Defendant Darren Hoo AKA Hoo Wei Sern ("Hoo") is and was the Company's Chief Executive Officer and Executive Director at all relevant times. At the time of the Company's IPO, Hoo indirectly held 72.3% of Megan ordinary shares and following the IPO, controlled 61.97% of the Company's ordinary shares.

16.     Defendant Ng Kai Tie ("Ng") is and was the Company's Chief Financial Officer at all relevant times. Defendant Tie.

17.     Defendant WWC, P.C. ("WWC" or the "Auditor Defendant") served as the Company's auditor from 2022 through December 15, 2025, and is headquartered in San Mateo, California.

18.     Defendant D. Boral Capital LLC ("DBC" or the "Underwriter Defendant") served as the Company's underwriter in connection with the IPO and accordingly, disseminated the Offering Documents to investors. DBC is headquartered in New York, New York.

19.     Defendants Hoo and Ng (collectively, the "Individual Defendants"), because of their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to the market, and were chiefly responsible for bringing the Company public. The Individual Defendants were provided with copies of the Company's public filings, reports, and press releases alleged herein to be materially misleading prior to, or shortly after, their issuance and had the ability, opportunity, and obligation to prevent their issuance or promptly correct them. Because of their respective positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representation which was being made was then materially false and/or misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.     Defendant WWC issued a clean audit opinion on the Company's financial statements incorporated into the Registration Statement issued in connection with the Company's IPO. Additionally, Defendant WWC was Megan's auditor throughout and for years prior to the

5

Class Period and had access to material non-public information. Because of its position, WWC knew or should have known that the adverse facts alleged herein had not been disclosed to and were being concealed from the investing public and that the positive representations being made were materially false and/or misleading. Furthermore, due to its position, Defendant WWC had the ability and opportunity to prevent issuance of fraudulent SEC filings or cause them to be corrected. Therefore, the Auditor Defendant is also liable for the materially false and misleading statements and omissions pleaded herein.

21.    The Underwriter Defendant was identified as the sole bookrunning manager on the IPO in the Company's Prospectus (defined below), the sole representative underwriter and signatory on the underwriting agreement between the Company and the underwriters (the "Underwriting Agreement") and agreed to conduct the IPO on a firm commitment basis. The Underwriter Defendant, based on its position, had the ability and opportunity to prevent the issuance of fraudulent SEC filings and/or cause them to be corrected. The Underwriter Defendant was also responsible for dissemination of the Prospectus to investors.

22.    The Underwriter Defendant has been involved in numerous other microcap initial public offerings since January 2024, which have been similarly disastrous for investors including serving as: (1) co-lead underwriter in connection with the December 2024 Park Ha Biological Technology, Co. Ltd., initial public offering priced at $4.00 per share, which collapsed in July 2025, losing 94% of its value and causing heavy investor losses; (2) the sole underwriter in connection with the July 2025 Masonglory Limited initial public offering, which collapsed approximately 97.6% from its highest closing price in October 2025 including a dramatic one-day collapse of 85.5% on October 2, 2025; (3) the lead representative underwriter in connection with the April 2025 Phoenix Asia Holding, initial public offering, which experienced a dramatic run-

up on January 30, 2026, to close at $133.12 per share after opening at just $12.35 per share, and then collapsing on the next trading day, February 2, 2026, down to $17.60 per share at closing; (4) the lead representative underwriter in connection with the July 2025 Robot Consulting Co., Ltd., initial public offering, which was halted by the SEC from trading between October 23, 2025, at 4:00 PM EST through 11:59 PM EST on November 5, 2025, and later, NASDAQ halted trading pending a request for information, which remains in effect; and (5) the lead underwriter on the August 2025 rYojbaba Co., Ltd. initial public offering, which experienced a dramatic run-up on October 21, 2025, closing at $9.12 per share, up 58.3% from the prior day's closing price, and trading as high as $11.43 per share intraday on volume in excess of 23,000,000 before declining to $6.10 per share on October 22, 2025, and presently trading for just $1.99 per share.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Material Misstatements and Omissions Are Contained in Megan's Offering Documents

23.     The Class Period begins on September 26, 2025, when the Company filed its IPO Prospectus permitting Megan to issue 1,250,000 shares at an initial offering price of $4.00 per share for a total capital raise of $5M (the "Prospectus"). In the Prospectus, which formed part of the registration statement filed in connection with the IPO (the "Registration Statement" and collectively, the "Offering Documents"), the Company described its business as follows:

> **Overview**
>
> We are a company principally engaged in the development, construction and maintenance of aquaculture farms and related works. Our operations are based in Malaysia. Since our inception in 2020, we have strived to establish ourselves as a trusted and experienced provider of shrimp farm related maintenance services in Malaysia. As of the date of this prospectus, we have been carrying out a series of upgrading and maintenance works for aquaculture farms, all of which are located in Tawau, Sabah, Malaysia. This constitutes 43.7%, 15.5% and 69.4% of our revenue for the financial years ended December 31, 2022, 2023 and 2024, respectively.

Besides that, we also carried out upgrading works for a pineapple plantation farm located at Kota Tinggi, Johor, Malaysia in 2022 and 2023. This constituted 25.3%, 22.6%, 0% of our revenue for the financial years ended December 31, 2022, 2023 and 2024, respectively.

Complementary to our upgrading and maintenance services, we also assist customers with the design and development of new farms. As of the date of this prospectus, we are currently involved in the development and construction of a shrimp hatchery center in Semporna, Sabah, Malaysia, where we have been engaged to undertake the construction of hatchery buildings and related functional facilities. We are also assisting in the development of a 111-acre shrimp farm at Tawau, Sabah, Malaysia. The design and development of new farms comprised 16.4%, 61.7% and 30.4% of our revenue for the financial years ended December 31, 2022, 2023 and 2024, respectively. From time to time, we also assist our customers in sourcing for building materials and machineries available for rental for use on their farms. This comprised 14.6%, 0.2% and 0.2% of our revenue for the financial years ended December 31, 2022, 2023 and 2024, respectively.

With our wide suite of services and diverse revenue streams, we are well-positioned to serve customers as a one-stop center for their aquaculture and agriculture needs.

**Our Services**

Once we have received a project from a customer, we collaborate with trusted subcontractors who provide the manpower and equipment to execute the necessary upgrading, maintenance, and construction tasks on an as needed basis, all while maintaining a hands-on approach to oversee every aspect of the process. Due to the labor intensity and complexity of some of these projects, we may on occasion engage several subcontractors to work on the same project.

*Upgrading and maintenance of aquaculture and agriculture farms*

We offer comprehensive upgrading and maintenance solutions tailored to the needs of our valued farm customers. To date, we have provided these services for aquaculture farms focused on shrimp production as well as for an agricultural farm for the production of pineapples.

We generate revenue from charging customers a project-based fee through progress claims, usually on a monthly basis. Once we have

submitted our progress claim to the customers, a site visit will be arranged to verify that the on-site progress matches the progress claim. Once verified, customers will proceed with the payment arrangement. We charge our customers based on an all-in rate that includes the cost from subcontractors, as well as the on-cost mark-up for our profit.

24.   Furthermore, the Company also discussed its "Competitive Strengths" in the Prospectus, stating the following, in pertinent part:

**Overview**

We are a company principally engaged in the development, construction and maintenance of aquaculture farms and related works. Our operations are based in Malaysia. Since our inception in 2020, we have strived to establish ourselves as a trusted and experienced provider of shrimp farm related maintenance services in Malaysia. As of the date of this prospectus, we have been carrying out a series of upgrading and maintenance works for aquaculture farms, all of which are located in Tawau, Sabah, Malaysia. This constitutes 43.7%, 15.5% and 69.4% of our revenue for the financial years ended December 31, 2022, 2023 and 2024, respectively. Besides that, we also carried out upgrading works for a pineapple plantation farm located at Kota Tinggi, Johor, Malaysia in 2022 and 2023. This constituted 25.3%, 22.6%, 0% of our revenue for the financial years ended December 31, 2022, 2023 and 2024, respectively.

Complementary to our upgrading and maintenance services, we also assist customers with the design and development of new farms. As of the date of this prospectus, we are currently involved in the development and construction of a shrimp hatchery center in Semporna, Sabah, Malaysia, where we have been engaged to undertake the construction of hatchery buildings and related functional facilities. We are also assisting in the development of a 111-acre shrimp farm at Tawau, Sabah, Malaysia. The design and development of new farms comprised 16.4%, 61.7% and 30.4% of our revenue for the financial years ended December 31, 2022, 2023 and 2024, respectively. From time to time, we also assist our customers in sourcing for building materials and machineries available for rental for use on their farms. This comprised 14.6%, 0.2% and 0.2% of our revenue for the financial years ended December 31, 2022, 2023 and 2024, respectively.

With our wide suite of services and diverse revenue streams, we are well-positioned to serve customers as a one-stop center for their aquaculture and agriculture needs.

**Our Services**

Once we have received a project from a customer, we collaborate with trusted subcontractors who provide the manpower and equipment to execute the necessary upgrading, maintenance, and construction tasks on an as needed basis, all while maintaining a hands-on approach to oversee every aspect of the process. Due to the labor intensity and complexity of some of these projects, we may on occasion engage several subcontractors to work on the same project.

*Upgrading and maintenance of aquaculture and agriculture farms*

We offer comprehensive upgrading and maintenance solutions tailored to the needs of our valued farm customers. To date, we have provided these services for aquaculture farms focused on shrimp production as well as for an agricultural farm for the production of pineapples.

We generate revenue from charging customers a project-based fee through progress claims, usually on a monthly basis. Once we have submitted our progress claim to the customers, a site visit will be arranged to verify that the on-site progress matches the progress claim. Once verified, customers will proceed with the payment arrangement. We charge our customers based on an all-in rate that includes the cost from subcontractors, as well as the on-cost mark-up for our profit.

25.    In the Prospectus, the Company also discussed its "Growth Strategy" by stating the following, in pertinent part:

**Our Growth Strategy**

We intend to develop our business and strengthen our customer base, by implementing the following strategies:

- **Market Development:** We are actively researching potential clients to expand our customer beyond Malaysia, as well as tapping into international markets, starting from neighboring countries such as Indonesia. By leveraging our reputation and established customer portfolio, we aim to build new relationships and penetrate new markets. This

10

market development strategy will allow us to tap into new revenue streams and increase our market share, driving our continued success in the industry.

- **Strategic Growth Initiatives:** As our customer base expands, we have the opportunity to identify potential partners for further business development. We propose equity participation in the entities of suitable clients, which would allow us to build a recurring revenue stream and potentially become one of our main sources of income. By forming strategic business partnerships, we can create a mutually beneficial relationship that drives our continued growth and success in the industry.

- **Development of Smart Farming System:** We intend to develop our own proprietary Smart Farming System, and we hope to establish a pilot scale project utilizing our Smart Farming System by the fourth quarter of 2024. Our Smart Farming System will offer several benefits including (a) water quality monitoring, (b) feeding optimization, (c) disease prevention, (d) environmental monitoring and (e) data analytics. Overall, the hardware development for our Smart Farming System will require a combination of sensors, actuators, cameras, control systems, connectivity, and power supply, all working together to optimize yields, improve resource efficiency, and promote sustainable farming practices. Our Chief Executive Officer, Mr. Darren Hoo has a degree in Biotechnology and has obtained vast experience in aquaculture and Electrical and Instrumentation engineering (E&I). Leveraging on his vast skills and experience, Mr. Darren Hoo is spearheading our venture into the development of our own proprietary Smart Farming System. With our Smart Farming System, we are poised to become a full-service aquaculture consulting company in 2025, with the provision of expert consulting and project management services being added to our business portfolio. We believe that, once developed, our Smart Farming System will be a key driver of our business growth, offering an effective tool for digital transformation in the aquaculture and agriculture industry. There are currently not many providing smart farming systems in Malaysia and neighboring countries. Hence, our solution addresses the market's demand for modernization. By leveraging modern technology, we hope to help our customers optimize their aquaculture and agriculture farms for maximum yield and profitability. Our system will closely monitor the operating parameters of each pond and alert customers to any

11

irregularities, enabling them to take corrective action and improve yield. In addition, the system captures a wealth of data that customers can use to analyze operational costs, estimate yields, and make informed decisions about their farms' financial performance. Ultimately, we hope that our Smart Farming System will allow us to offer customers a more comprehensive and effective solution for their aquaculture and agriculture needs. Promoting the adoption of Smart Farming Systems will require a multi-faceted approach:

(a)     Demonstrating the benefits: By showcasing the benefits of increased productivity, reduced costs, improved resource efficiency, and enhanced sustainability, we can motivate customers to adopt our Smart Farming System. Our existing customers have expressed interest in becoming pioneers of our Smart Farming System, allowing us to demonstrate its value to other potential customers.

(b)     Providing training and support: Our Smart Farming System will require specialized knowledge and skills. We plan to offer workshops, training programs, and online resources to help customers understand how to effectively use the system and maximize its benefits.

(c)     Creating policies and incentives: We plan to collaborate with the Ministry of Agriculture Malaysia to promote modernization in agriculture, including our Smart Farming System, through tax incentives, subsidies, and research grants.

(d)     Collaborating with industry partners: We plan to partner with technology providers and financial institutions to help develop and implement new technologies, provide financing for customers, and share best practices and knowledge.

(e)     Developing networks and communities: We plan to create networks and communities of industry stakeholders to provide opportunities for collaboration, support, and information sharing, building a sense of community among farmers.

(f)     By adopting these strategies, we believe we can accelerate our adoption of smart farming technologies and help create more sustainable and productive aquaculture and agricultural sectors in Malaysia

26.     The Prospectus also contained consolidated balance sheets for fiscal years 2022, 2023 and 2024, as well as the accompanying Report of Independent Registered Public Accounting

12

Firm signed by Defendant WWC regarding the financial results of 2022, 2023 and 2024.

Specifically, Defendant WWC reported the following:

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Megan Holdings Limited and its subsidiaries (collectively the "Company") as of December 31, 2022, 2023 and 2024, and the related consolidated statements of comprehensive income, changes in shareholders' equity, and cash flows in each of the years for the three-year period ended December 31, 2024, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022, 2023 and 2024, and the results of its operations and its cash flows in each of the three-year period ended December 31, 2024, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These consolidated financial statements are the responsibility of our management. Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of our internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that

13

respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

27.    The Prospectus also included vague, boilerplate disclosures regarding risk factors that could hypothetically adversely affect the Company and its investors, including the following:

*If we fail to implement and maintain an effective system of internal controls, we may be unable to accurately or timely report our results of operations or prevent fraud, and investor confidence and the market price of our Ordinary Shares may be materially and adversely affected.*

Prior to this offering, we were a private company with limited accounting personnel and other resources to address our Company's internal controls and procedures. Our management has not performed an assessment of the effectiveness of our internal control over financial reporting, and our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting. Effective internal control over financial reporting is necessary for us to provide reliable financial reports and, together with adequate disclosure controls and procedures, is designed to prevent fraud.

Our failure to implement and maintain effective internal controls over financial reporting could result in errors in our financial statements that could result in a restatement of our financial statements, cause us to fail to meet our reporting obligations and cause investors to lose confidence in our reported financial information, which may result in volatility in and a decline in the market price of the Ordinary Shares.

Upon the completion of this offering, we will become a public company in the United States subject to the Sarbanes-Oxley Act of 2002. Section 404 of the Sarbanes-Oxley Act of 2002, or Section 404, will require that we include a report of management on our internal control over financial reporting in our annual report on Form 20-F. In addition, if we cease to be an "emerging growth company" as such term is defined in the JOBS Act, our independent registered public accounting firm must attest to and report on the effectiveness of our internal control over financial reporting on an annual basis. Our management may conclude that our internal

control over financial reporting is not effective. Moreover, even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm, after conducting its own independent testing, may issue a report that is qualified if it is not satisfied with our internal controls or the level at which our controls are documented, designed, operated or reviewed, or if it interprets the relevant requirements differently from us. In addition, after we become a public company, our reporting obligations may place a burden on our management, operational and financial resources and systems for the foreseeable future. We may be unable to timely complete our evaluation testing and any required remediation.

During the course of documenting and testing our internal control procedures, in order to satisfy the requirements of Section 404, we may identify material weaknesses and deficiencies in our internal control over financial reporting. The Public Company Accounting Oversight Board, or PCAOB, has defined a material weakness as "a deficiency, or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim statements will not be prevented or detected on a timely basis".

In addition, if we fail to maintain the adequacy of our internal control over financial reporting, as these standards are modified, supplemented or amended from time to time, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404. Generally speaking, if we fail to achieve and maintain an effective internal control environment, we could suffer material misstatements in our financial statements and fail to meet our reporting obligations, which would likely cause investors to lose confidence in our reported financial information. This could in turn limit our access to capital markets, harm our results of operations and lead to a decline in the trading price of our Ordinary Shares. Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud, misuse of corporate assets and legal actions under the United States securities laws and subject us to potential delisting from the Nasdaq Capital Market to regulatory investigations and to civil or criminal sanctions.

\*          \*          \*          \*          \*

***Certain recent initial public offerings of companies with public floats comparable to the anticipated public float of our company have experienced extreme volatility that was seemingly unrelated to the underlying performance of the respective company. We may***

15

*experience similar volatility. Such volatility, including any stock-run up, may be unrelated to our actual or expected operating performance and financial condition or prospects, making it difficult for prospective investors to assess the rapidly changing value of our Ordinary Shares.*

Recently, there have been instances of extreme stock price run-ups followed by rapid price declines and strong stock price volatility with recent initial public offerings, especially among those with relatively smaller public floats. As a relatively small-capitalization company with relatively small public float, we may experience greater stock price volatility, extreme price run-ups, lower trading volume and less liquidity than large-capitalization companies. In particular, our Ordinary Shares may be subject to rapid and substantial price volatility, low volumes of trades and large spreads in bid and ask prices. Such volatility, including any stock-run up, may be unrelated to our actual or expected operating performance and financial condition or prospects, making it difficult for prospective investors to assess the rapidly changing value of our Ordinary Shares.

In addition, if the trading volumes of our Ordinary Shares are low, persons buying or selling in relatively small quantities may easily influence prices of our Ordinary Shares. This low volume of trades could also cause the price of our Ordinary Shares to fluctuate greatly, with large percentage changes in price occurring in any trading day session. Holders of our Ordinary Shares may also not be able to readily liquidate their investment or may be forced to sell at depressed prices due to low volume trading. Broad market fluctuations and general economic and political conditions may also adversely affect the market price of our Ordinary Shares. As a result of this volatility, investors may experience losses on their investment in our Ordinary Shares. A decline in the market price of our Ordinary Shares also could adversely affect our ability to issue additional shares of Ordinary Shares or other of our securities and our ability to obtain additional financing in the future. An active market in our Ordinary Shares might not develop or be sustained if it does. If an active market does not develop, holders of our Ordinary Shares may be unable to readily sell the shares they hold or may not be able to sell their shares at all.

28.     With respect to the reasons behind the Company's IPO, the Prospectus stated the following regarding its intentions post-IPO and how it would use the net proceeds:

**USE OF PROCEEDS**

We will receive gross proceeds of US$5,000,000 from the sale of our Ordinary Shares in this offering. After deducting the underwriting discounts and offering expenses payable by us and assuming no exercise of the underwriters' over-allotment option, we expect to receive net proceeds of approximately US$2,801,000 from this offering.

We currently intend to use proceeds from this offering in the following ways:

***Sales and Marketing*** — We intend to use 20% of the proceeds for the business developments. This allocation reflects our commitment to expanding brand awareness, reaching new customers, and driving revenue growth through targeted sales and marketing initiatives.

***Expansion opportunities through merger and acquisition activities*** — We intend to use 30% of the proceeds to explore growth through the opportunities to collaborate with suitable partners in related industries through strategic alliances, joint ventures, acquisitions and investments. We have not yet determined the target. If a suitable opportunity arises, we may collaborate with potential partners in the aquaculture and agriculture industries if these collaborations are likely to provide us with more business opportunities.

***Development of Smart Farming System*** — We intend to use 30% of the proceeds to develop Smart Farming System which is a farm management system that will leverage on information technology infrastructure for data collection, farm monitoring and analysis. This strategic investment will allow us to provide additional value to our customers once developed.

***Working Capital*** — We intend to use 20% of the proceeds for general working capital and corporate purposes.

We would receive additional net proceeds of US$690,000 assuming full exercise of the underwriters' over-allotment option. We intend to use any such proceeds for working capital and general corporate purposes. General corporate purposes may include capital expenditures.

29.     The statements identified above in paragraphs 23 through 28 were and are false and misleading because the statements failed to disclose that: (1) Megan was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and

impersonators posing as financial professionals; (2) Megan's public statements and risk disclosures omitted any mention of the realized risk of fraudulent trading or market manipulation used to drive the Company's stock price; (3) as a result, Megan securities were at unique risk of a sustained suspension in trading by NASDAQ and severe volatility-induced decline; (4) DBC, the sole bookrunning manager, had conducted numerous microcap IPOs that suffered volatility-induced declines resulting from market manipulation schemes; (5) the Company suffered from material weaknesses in its internal accounting and financial reporting controls; and (6) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

30.    Defendants Hoo and Ng signed the Registration Statement. The Prospectus contains the signature of the Auditor Defendant with respect to its opinion and report on the Company's financial statements. The Prospectus identifies Defendant DBC as the "sole bookrunning manager" for the IPO and DBC was a party and the sole signatory to the Underwriting Agreement, which was submitted as Exhibit 1.1 to the Form F.1/A Registration Statement filed by the Company on September 9, 2025. The Underwriting Agreement expressly provides in pertinent part in Section 4.6 under the heading No Material Misstatement or Omission that:

> The Underwriters shall not have discovered and disclosed to the Company on or prior to the Closing Date and any Option Closing Date that the Registration Statement or any amendment or supplement thereto contains an untrue statement of a fact which, in the opinion of counsel for the Underwriters, is material or omits to state any fact which, in the opinion of such counsel, is material and is required to be stated therein or is necessary to make the statements therein not misleading, or that the Registration Statement, the Pricing Disclosure Package, any Issuer Free Writing Prospectus or the Prospectus or any amendment or supplement thereto contains an untrue statement of fact which, in the opinion of such counsel, is material or omits to state any fact which, in the opinion of such counsel, is material and is necessary in order to make the statements,

in the light of the circumstances under which they were made, not misleading.

Accordingly, the Underwriter Defendant had the opportunity to review the Offering Documents publicly filed with the SEC.

31.    In Section 3.18, the Underwriting Agreement included a section with the heading "Company Lock-Up Agreement[,]" (the "IPO Lock-Up Agreement") which stated the following:

> ***The Company, on behalf of itself and any successor entity, agrees that, without the prior written consent of the Representative, it will not, during the period of one hundred eight (180) days from the Closing Date (the "Lock-Up Period")***, (i) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of the Company or any securities convertible into or exercisable or exchangeable for shares of capital stock of the Company; (ii) file or cause to be filed any registration statement with the Commission relating to the offering of any shares of capital stock of the Company or any securities convertible into or exercisable or exchangeable for shares of capital stock of the Company, (iii) complete any offering of debt securities of the Company, other than entering into a line of credit with a traditional bank or (iv) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of shares of the Company, whether any such transaction described in clause (i), (ii) (iii) or (iv) above is to be settled by delivery of shares of the Company or such other securities, in cash or otherwise. The restrictions contained in this Section 3.18 shall not apply to (i) the Securities to be sold hereunder, (ii) the issuance by the Company of Ordinary Shares upon the exercise of a share option or warrant or the conversion of a security outstanding on the date hereof, which is disclosed in the Registration Statement, Pricing Disclosure Package and Prospectus and (iii) the issuance by the Company of share options under any equity compensation plan of the Company described in the Registration Statement, Pricing Disclosure Package and the Prospectus.

(emphasis added.)

32.    The persons and entities subject to the IPO Lock-up Agreement were Defendants Hoo and Ng, along with Long Jia Kwang, Tse Yin Sun, SSL, Tan Chui Fang, Usaha Sedava Sdn

19

Bhd ("USSB"), Yat Ho Construction Materials Limited ("YHCML"), Eternity Capital Group Limited ("ECGL"), Kapiti Latino Sdn Bhd ("KLSB"), Kheng Builders Sdn Bhd ("KBSB"), Malama Sdn Bhd ("MSB"), and SJCC Holdings Sdn Bhd ("SHSB"). USSB, YHCML, ECGL, KLSB, KBSB, MSB, and SHSB each held less than 5% interest in Megan.

33.　In Section 1.1.2 entitled "Firm Securities Payment and Delivery[,]" the Company and the Underwriter Defendant defined the "Closing Date" as follows:

> (i) Delivery and payment for the Firm Securities shall be made at 10:00 a.m., Eastern time, on the Business Day following the effective date (the "Effective Date") of the Registration Statement (as defined in Section 2.1.1 below) (or the second (2nd) Business Day following the Effective Date if the Registration Statement is declared effective after 4:01 p.m., Eastern time) or at such earlier time as shall be agreed upon by the Representative and the Company, at the offices of Loeb & Loeb LLP, 345 Park Avenue, New York, NY 10154 ("Underwriters' Counsel"), or at such other place (or remotely by facsimile or other electronic transmission) as shall be agreed upon by the Representative and the Company. The hour and date of delivery and payment for the Firm Securities is called the "Closing Date."

34.　As the SEC issued the Notice of Effectiveness for the Company's Registration Statement on September 22, 2025, the "Closing Date" in connection with the Company's IPO was September 23, 2025.

35.　According to the Prospectus, Hoo, by and through his interest in Star Sprite Limited ("SSL"), held 10,845,000 ordinary shares or 72.3% of the ordinary shares at the time of the IPO and would control 61.97% following the IPO. Hoo was among those subject to the IPO Lock-Up Agreement. No other person or entity was identified as having greater than 5% interest in Megan.

36.　The Prospectus stated the following with respect to the Company's ordinary shares:

> **Ordinary Shares**
>
> Before our initial public offering, there has not been a public market for our Ordinary Shares, and although we have received approval from Nasdaq to list our Ordinary Shares on the Nasdaq Capital

Market, a regular trading market for our Ordinary Shares may not develop. Future sales of substantial amounts of shares of our Ordinary Shares in the public market after our initial public offering, or the possibility of these sales occurring, could cause the prevailing market price for our Ordinary Shares to fall or impair our ability to raise equity capital in the future.

Upon completion of this offering at an offering price of US$4.00 per Ordinary Share, we will have 16,250,000 Ordinary Shares outstanding, assuming no exercise of the underwriters' over-allotment option. As of the date of this prospectus, we had granted no options and have no outstanding warrants.

All of the Ordinary Shares sold in this offering will be freely transferable by persons other than by our "affiliates" as described below without restriction or further registration under the Securities Act. Sales of substantial amounts of our ordinary share in the public market could adversely affect prevailing market prices of our ordinary share. Prior to this offering, there has been no public market for our Ordinary Shares. We have received the approval from Nasdaq to list the Ordinary Shares on the Nasdaq Capital Market under the symbol "MGN".

37.     Accordingly, at the time of the IPO, the Company had 4,155,000 shares outstanding that were not held by Defendant Hoo, a majority of which were held by USSB, YHCML, ECGL, KLSB, KBSB, MSB, and SHSB, collectively.

## B.     The Company Conducts Its Low-Float IPO and Experiences Heavy Trading Volume

38.     The Company's micro-cap IPO left the Company and its investors susceptible to a market manipulation and a "pump-and-dump" scheme. By offering just 1.25 million shares to the public, co-conspirators may have benefitted from the scheme through offshore holding entities and affiliates. The scarce public float allowed for price manipulation because even modest buying pressure could create explosive price movement.

39.     On its first day of trading, September 26, 2025, the Company's stock price surged as high $8.63 per share before closing at $4.85 per share on relatively high trading volume of 7,979,300.

21

40.      In the weeks following the IPO, the trading volume in the Company's stock shrunk relative to the period immediately following the IPO. Between October 1, 2025, and October 21, 2025, the highest daily trading volume was 356,400 (October 2, 2025) and lowest daily trading volume was just 32,100 (October 21, 2025). During this timeframe, the Company's average daily trading volume was 169,007.

41.      On October 22, 2025, the Company and Defendant Hoo jointly filed Schedule 13D with the SEC concerning his ownership interest in the Company. On that date, the Company's shares experienced a significant spike in trading activity with daily trading volume surging to 4,389,200 - a float turnover ratio in excess of 3.5, indicating extreme volatility. On the next trading day, trading activity in the Company's stock surged again with daily trading volume of 6,959,200 – a float turnover ratio in excess of 5.56, once again indicating extreme volatility. During these two days, the Company's stock price declined from a closing price of $2.44 per share on October 21, 2025, down to $1.99 per share on October 23, 2025, a two-day decline of 18.44%.

42.      Then, from October 24, 2025, through December 31, 2025, the Company traded at significantly lower volumes including multiple days where the daily trading volume failed to reach 10,000. During this time period, the Company's average daily trading volume was just 52,389.

43.      On November 21, 2025, the Company filed a Form 6-K with the SEC announcing that Long Jia Kwang had notified Megan of his resignation as independent director, chairman of the audit committee and member of the nominating and compensation committees effective October 31, 2025. According to the filing, the resignation was due to "personal commitments and was not the result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices." The Company also announced the appointment of Phua Zhi Yong as an independent director, chairman of the audit committee, and member of the nominating

and compensation committees. Despite this news, the Company's daily trading volume remained relatively low with daily trading volume of 79,700 on November 21, 2025, and 119,100 on November 24, 2025, the next trading day.

44.     On December 15, 2025, Megan filed a Form 6-K with the SEC announcing dismissal of Defendant WWC as the Company's independent registered public accounting firm, an act approved and ratified by the Company's Board on December 15, 2025. Further, Megan announced that the Audit Committee and Board of Directors approved and ratified the engagement of SFAI MALAYSIA PLT as the Company's new independent registered public accounting firm to audit and review the Company's consolidated financial statements, effective December 15, 2025. On this news, the Company's ordinary share price declined from a closing price of $2.07 on December 15, 2025, down to $1.75 per ordinary share on December 17, 2025, a two-day decline of 15.6%.

45.     On January 21, 2026, the Company filed a Form F-1 Registration Statement (the "Secondary F-1") in connection with an anticipated supplemental offering (the "Secondary Offering"). In connection with the Secondary Offering, which was not priced at this time, the Company announced that Defendant DBC would serve as "the exclusive placement agent in connection with the offering." Further, the Secondary F-1 included another Report of Independent Registered Public Accounting Firm signed by Defendant WWC, which was substantially similar to that issued in connection with the Offering Documents.

46.     On February 2, 2026, the Company filed a Form 6-K announcing the results of its annual general meeting of Company shareholders convened on January 27, 2026. Therein, among other things, shareholders approved the retention of SFAI MALAYSIA PLT as the Company's independent registered public accounting firm for the fiscal year ending on December 31, 2025,

23

and in a separate resolution and in connection with the adoption of a dual class structure, approved the appointment of HTL International LLC as the Company's independent registered public accounting firm for the fiscal year ending on June 30, 2026. Accordingly, in a span of less than a year, the Company had gone through three different independent registered accounting firms.

47.    On February 13, 2026, the Company filed a Form F-1/A amendment to the Secondary F-1. In this filing, the Company revealed that it would be offering 20,750,000 class A ordinary shares "at an assumed offering price of US$0.40" along with "Pre-Funded Warrant[s] … sold at an assumed offering price of US$0.3999." Megan also stated that the Company was "offering up to 20,750,000 Class A Ordinary Shares issuable upon exercise of the Pre-Funded Warrants offered hereby."

48.    Despite these events, the Company's daily trading volume remained relatively low at this time. Between January 1, 2026, and February 17, 2026, a total of thirty-one trading days, the Company's daily average trading volume was just 55,148 and included multiple days where the Company's ordinary shares were only traded thousands of times.

49.    On February 26, 2026, the Company issued a press release announcing the pricing of its Secondary Offering at $0.40 per ordinary share, that the offering was being conducted on a reasonable best-efforts basis with Defendant DBC acting as exclusive placement agent and that it was expected to close on or about February 27, 2026.

50.    On this news, the Company's stock price climbed from a close of $1.23 per share on February 25, 2026, on daily trading volume of just 251,500 up to $1.80 per share on over a tenfold increase of daily trading volume to 2,618,200.

51.    On February 27, 2026, the Company filed a Form 6-K and announced that on February 25, 2026, Megan entered into a Securities Purchase Agreement with certain purchasers

24

pursuant to which the Company agreed to issue and sell 20,750,000 Class A ordinary shares at a public offering price of $0.40 per share, for aggregate proceeds of $8.3 million. On the same date, the Company issued a press release announcing the closing of the offering.

52. In connection with the Secondary Offering, the Company's directors, executive officers, and shareholders holding 5% or more of the Company's outstanding Class A Ordinary Shares or Class B Ordinary Shares were subject to lock-up agreements for a period of 180 days following the closing of the Secondary Offering (the "Secondary Lock-Up"). There is no indication that USSB, YHCML, ECGL, KLSB, KBSB, MSB, and SHSB were subject to the Secondary Lock-Up.

53. Furthermore, a Rule 424(b)(4) Prospectus was filed in connection with the Secondary Offering (the "Secondary Prospectus"). The Secondary Prospectus omitted any mention that similar, foreign, microcap companies had seen their stock experience extreme volatility unrelated to the underlying performance. The omission is especially egregious because the Company had already experienced extreme volatility, been targeted by market manipulators, and the risk of run-up was heightened, if not certain to occur.

54. The Secondary Prospectus contained a Report of Independent Public Accounting Firm from WWC, which was duplicative of the one issued in connection with the IPO.

55. Likewise, DBC was identified as the Company's "exclusive placement agent" in connection with the Secondary Offering. DBC conditioned the closing of the Secondary Offering on its right to review the Secondary Prospectus and offering materials to ensure that the materials did not contain "an untrue statement of a fact which, in the reasonable opinion of counsel for the Placement Agent, is material or omits to state any fact which, in the reasonable opinion of such

25

counsel, is material and is required to be stated therein or is necessary to make the statements therein not misleading."

56. The statements identified above in paragraphs 53 through 55 were and are false and misleading because the statements failed to disclose that: (1) Megan was the subject of a market manipulation and fraudulent promotion scheme involving social-media-based misinformation and impersonators posing as financial professionals; (2) Megan's public statements and risk disclosures omitted any mention of the realized risk of fraudulent trading or market manipulation used to drive the Company's stock price; (3) as a result, Megan securities were at unique risk of a sustained suspension in trading by NASDAQ and severe volatility-induced decline; (4) DBC, the sole bookrunning manager, had conducted numerous microcap IPOs that suffered volatility-induced declines resulting from market manipulation schemes; (5) the Company suffered from material weaknesses in its internal accounting and financial reporting controls; and (6) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

57. In the days following the closing of the Secondary Offering, the Company's stock price continued climbing despite the fact that the Secondary Offering was conducted at a price that was a significant discount to the then-current trading price. By March 3, 2026, the Company's ordinary share price had risen to $2.98 per share on daily trading volume of 1,655,300.

58. Megan ordinary shares continued to surge in value closing at $4.70 per share on March 20, 2026, a rise of 282% from February 25, 2026, the day before the Company announced the pricing of the Secondary Offering. During this window of time, the Company made no announcements and there was no news regarding the Company that would trigger such a surge in the stock price.

26

59. Despite these unusual developments in both trading volume and price, indicating the materialized risk of manipulation, the Company and Individual Defendants were silent.

**C.     The Market Manipulation Scheme Drives the Stock Gains**

60. Although public filings and news were scarce regarding the Company even as both stock price and trading volume surged, a coordinated effort was made on social media and messaging applications, such as WhatsApp, to "pump" Megan led by stock promoters posing as financial advisors. Based on information and belief, these stock promoters used aliases and false photographs to conceal their true identities and were key cogs in the stock manipulation scheme surrounding Megan.

61. These stock promoters targeted investors on social media via advertisements and posts, which solicited them to join stock trading and tips "groups" on messaging applications. Once the investor joined the group, a stock promoter, posing as a financial advisor, would provide false and misleading information regarding the Company's stock and its potential, and encourage the investor to "maximize" their funds to achieve the largest profit. The promoter would also require the investor to send them screenshots of the trade when completed. Indeed, the stock promotion and market manipulation campaign began in October 2025, at the latest.

62. For instance, towards the end of the Class Period, one WhatsApp group, referred to Megan as an "Insider Rocket Stock" imploring investors to enter a "Strict Limit Buy" at $4.73 per share with "Position Allocation: 100% of Capital" and a "Target Price: ~$9 or more" and a "Projected Return" of at least "30% to over 80%."

63. In soliciting investors, the promoters offered an "Analysis of Institutional Capital Flows[,]" which stated that "[r]ecently, MGN has shown clear signs of concentrated institutional capital inflows. By examining trading volume and order distribution in the order book, we observe a significant increase in trading volume within the $4.70 to $4.85 range, indicating that

professional investors' buying interest remains strong and sustained. At the same time, selling pressure remains relatively limited, and overall capital flows show a net inflow. This indicates that buying support is solid at current price levels, laying the groundwork for a short-term rally; it also validates the rationale behind our entry at the $4.73 price point."

64.    Further, the promoters cited "Technical Support" stating that "[f]rom the candlestick chart and moving average trends, MGN's price has formed multiple technical supports around the $4.73 level after a previous rapid pullback. The trading volume has significantly increased near this support zone, indicating that buying pressure is stronger than selling pressure. The short- and mid-term moving averages are aligned in an upward direction, the MACD has formed a bullish crossover, and the momentum indicator (RSI) has not yet entered the overbought zone. The short-term trend is clearly bullish, providing strong technical support for the limit buy order."

65.    Promoters also explained that "Fundamental Validation" supported the investment, explaining that "MGN's business sector is showing steady growth, with both revenue and market demand accelerating. The company's recent financial reports show improved profitability in its core business, rapid market share growth, and benefits from overall industry expansion and favorable policies. The fundamentals, combined with technical and money flow factors, create a triple resonance, providing support for the $4.73 entry price."

66.    These efforts created an investor base of buyers for the Company's ordinary shares, inflating the stock price and permitting conspirators to unload their shares often acquired for little or no cost at artificially inflated levels and profiting therefrom, while investors suffered staggering losses.

28

D.    **Regulators Take Aim at Companies Similar to Megan and DBC Becomes a Target**

67.    On September 3, 2025, just before Megan's IPO, the NASDAQ issued a press release entitled "NASDAQ PROPOSED CHANGES TO ITS LISTING STANDARDS[,]" in which NASDAQ announced proposals aimed at regulating micro-cap, low public float companies, like Megan, that had increasingly become vehicles of fraud. The press release stated the following in pertinent part:

> Today, Nasdaq proposed a new set of enhancements to its initial and continued listing standards, reinforcing its long-standing commitment to capital formation while ensuring investor protection and upholding market integrity. These proposed updates introduce enhanced requirements for minimum company public float and capital raised during initial public offerings, alongside stricter suspension and delisting procedures for companies failing to meet Nasdaq's continued listings standards.
>
> The revised standards include:
>
> - A $15 million minimum market value of public float, applicable to new listings on Nasdaq under the net income standard.
>
> - An accelerated process for suspending and delisting companies with a listings deficiency that also have a Market Value of Listed Securities below $5 million.
>
> - A $25 million minimum public offering proceeds requirement for new listings of companies principally operating in China.
>
> "***Investor protection and market integrity are central to Nasdaq's mission***," said John Zecca, Executive Vice President and Global Chief Legal, Risk & Regulatory Officer. "These enhancements reflect our ongoing commitment to evolve our standards in step with market realities and to lead by example in promoting fair and orderly markets. By increasing our standards for the minimum public float and the public offering raise in certain new listings, it provides a healthier liquidity profile for public investors, while still making emerging companies available to investors through our exchange. These new listing standards represent one step in a necessary, industry-wide effort—alongside regulators, U.S. exchanges, and

29

market participants—to closely examine trading behaviors in small company securities, with the goal of safeguarding market integrity and enhancing protections for investors."

***The actions announced today follow Nasdaq's proactive review of trading activity, particularly emerging patterns associated with potential pump-and-dump schemes in U.S. cross-market trading environments.*** The proposed updates are also reflective of how market dynamics and company valuations have evolved over time, prompting the need to recalibrate Nasdaq's minimum liquidity standards to suit today's environment. These enhancements ensure that the thresholds for public listings remain relevant and effective as markets evolve.

As part of these changes, Nasdaq is reintroducing a minimum public offering proceeds requirement specifically for companies principally operating in China, building on previous standards set for "restrictive markets," in which the Public Company Accounting Oversight Board (PCAOB) could not inspect auditors.[1] By applying this threshold, Nasdaq strengthens investor protections and enhances the liquidity profile of companies to reflect today's market environment.

In addition to the enhanced listing standards, ***Nasdaq will continue to actively refer cases to the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) on potentially manipulative trading activities, while strengthening our cooperation with both domestic and international regulators to reinforce effective oversight and maintain high standards across U.S. markets.***

(emphasis added.)

68.    Accordingly, NASDAQ was seeking to impose more rigid standards on companies with the profile of Megan and cooperating with both the SEC and the Financial Industry Regulatory Authority ("FINRA") to identify manipulative trading activities.

69.    On September 5, 2025, the SEC issued a press release, which announced "the formation of a task force that will strengthen and enhance the Division of Enforcement's efforts to identify and combat cross-border fraud harming U.S. investors." In the release, the SEC explained, in pertinent part, that "[t]he Cross-Border Task Force will focus initially on investigating potential

U.S. federal securities laws violations related to foreign-based companies, including potential market manipulation, such as 'pump-and-dump' and 'ramp-and-dump' schemes."

70.     On September 12, 2025, the U.S. Department of Justice ("DOJ") issued a press release entitled "Co-CEO of Chinese Publicly Traded Technology Company and Financial Advisor Indicted for Over $100M Securities Fraud Scheme," which stated the following, in pertinent part:

> According to the indictment, Lai Kui Sen is the co-CEO of OST, and Yan Zhao, who goes by the aliases Hank Shi and Hank Shu, among others, is a financial advisor. ***OST is a Cayman Islands company with its principal operations in China***, that claimed to be a manufacturer of display modules used in consumer electronics, commercial LCD displays, and automotive displays. OST is publicly traded on NASDAQ and operated, at one point, with a variable interest entity (VIE) investment structure, which is often used by Chinese companies.
>
> According to the indictment, Sen, Zhao, and others allegedly engaged in a ***complex scheme to first provide a group of fifteen co-conspirators with tens of millions of OST shares through two non-bona fide securities transactions***. In one of these transactions, these co-conspirators paid nothing to OST for more than 70 million OST shares.
>
> The indictment alleges that, ***on April 15, 2025, the same day that the select investors received their first tranche of heavily discounted OST shares, a fraudulent campaign began to artificially inflate the price and trading volume of the OST stock. This included promoting the stock by impersonating real investment advisors, among others, promoting the stock on social media, and creating a false impression of market-wide buying momentum.*** To capitalize on OST's artificial price inflation and to harm the victim investors, Zhao and Sen facilitated the opening of brokerage accounts for certain select investors and orchestrated the selling of the shares that they had received either heavily discounted or for no remuneration. ***These sales generated substantial profits of approximately more than $110 million. Ultimately, according to the indictment, unwitting investors suffered significant losses when, on June 26, 2025, OST lost over $950 million in market capitalization, representing over 94% of its value.***
>
> (emphasis added.)

31

71. On September 17, 2025, the SEC filed its Verified Opposition to Petitioner's Motion to Quash Subpoena under the Right to Financial Privacy Act of 1978 in the matter of *Peiyong v. U.S. Securities and Exchange Commission*, Case No. 1:25-mc-00350 (Dkt. No. 7).[1] Therein, the SEC stated the following, in pertinent part:

> SEC Staff is investigating whether ***dozens of IPOs registered with the SEC and trading on U.S. exchanges between 2020 and 2025 (the "Relevant Offerings") were used as vehicles in a suspected IPO manipulation scheme ("Suspected IPO Manipulation Scheme") orchestrated by the persons and entities with ties to Hong Kong and China (the "Syndicate").*** In the days, weeks, and/or months following its IPO, each issuer's securities ***experienced unusual, extreme, and unexplained price movements, generally consisting of a large upward price spike followed by a drop to a price far below the high and often below the offering price.*** Today, these issuers' securities typically trade at a fraction of the offering price.
>
> SEC Staff's investigation indicates that ***the unusual price movements following the Relevant Offerings may have resulted from illegal market manipulation that the Syndicate orchestrated.*** Specifically, SEC Staff has information that tends to show that:
>
> - individuals and entities affiliated with the Syndicate acquired most of the issuers' public float by purchasing shares in many Relevant Offerings;
>
> - shortly after the Relevant Offerings, anonymous third parties on the Internet convinced investors to purchase the issuers' securities at prices substantially higher than they were offered; and
>
> - the accounts under the Syndicate's control that participated in the Relevant Offerings sold the issuers' shares at a significant profit into the bubble the solicitations created.

---

[1] On January 13, 2023, the SEC issued a Formal Order Directing Private Investigation and Designating Officers to Take Testimony in *In the Matter of Market Manipulation in Certain IPOs* (HO-14588) (the "Formal Order"). The Formal Order states that the SEC has information that tends to show that "U.S. Broker Dealers[,]" "Issuers[,]" "Hong Kong Broker-Dealers[,]" and "other persons and entities" may have been or may be engaging in violations of the federal securities laws including Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

*Id.* at 3-4 (emphasis added).

72.     Later, on October 7, 2025, United States District Court Judge Dale E. Ho denied the Motion to Quash and granted enforcement of the subpoena. In his Memorandum Order, Judge Ho explained that the SEC clearly linked the petitioner to its investigations, noting that the petitioner "'appears to have also received significant proceeds from the Suspected IPO Manipulation scheme from other suspected [scheme] members,' including 'an entity in which [he] purchased a 40% ownership interest in,' and that one alleged entity connected with the scheme 'disbursed a significant portion of . . . funds to other accounts related to Petitioner,' including 'one of [his] personal bank accounts.'"[2] Memorandum Order at 5 (quoting SEC Opp'n at 5).

73.     Accordingly, regulators had identified companies with a similar profile to Megan - recently IPO-ed, foreign micro-cap companies with miniscule public floats - as, at minimum, problematic for investors, and at most, vehicles specifically designed to deceive investors, commit securities fraud, and market manipulation. Further, the SEC and DOJ were actively investigating and pursuing enforcement proceedings against potential co-conspirators and perpetrators of securities fraud via an IPO stock manipulation scheme similar to that alleged herein.

74.     Weeks before Megan's collapse, on March 8, 2026, DBC, which also served as exclusive placement agent for the heavily discounted Secondary Offering, received an information request from the U.S. House of Representatives' Select Committee on China co-signed by Rep. John Moolenaar and Rep. Ro Khanna (the "Moolenaar-Khanna Letter"). The letter stated the following, in pertinent part:

---

[2] At this time, Plaintiff lacks sufficient information linking Han Peiyong or his affiliates directly to Megan and accordingly, cannot name Mr. Peiyong in connection with this Complaint.  However, discovery could yield more information regarding Mr. Peiyong's (or others') involvement in the alleged violations of law specific to Megan and in turn, Mr. Peiyong and/or his affiliates (or other similar persons and affiliates) could be named as a Defendant or Defendants in an amended pleading.

We are writing to request information regarding D. Boral Capital's underwriting of initial public offerings (IPOs) by Chinese companies. The Chinese Communist Party (CCP) is enabling a systematic assault on American investors through scam centers operated by organized crime networks in the People's Republic of China (PRC) and CCP-aligned nations. These scam centers defraud American households through coordinated "ramp-and-dump" stock manipulation schemes involving Chinese shell companies listed on American exchanges, which your firm appears to facilitate. Bloomberg News estimates that $16 billion in American wealth has been extracted through these schemes since 2023, with 25% of small-tier Chinese IPOs showing evidence of manipulation.

The scale of this CCP-enabled fraud is staggering. The Federal Bureau of Investigation (FBI) has documented a 300% increase in complaints related to these Chinese stock manipulation schemes. The Department of Justice (DOJ) has secured criminal indictments against ten individuals linked to the PRC, seized over $214 million in fraudulent proceeds, and obtained a $37.9 million forfeiture after defendant Ming-Shen Cheng abandoned his claim rather than contest it—tantamount to an admission of guilt. The Securities and Exchange Commission (SEC) has issued 12 trading suspensions of Chinese variable interest entity (VIE) companies since September 2025, compared to just two in all of 2024. Charles Schwab has restricted trading in approximately 200 Chinese-linked companies and sent a letter to NASDAQ calling for listing reforms.

The Select Committee on the Chinese Communist Party is investigating the role of U.S. financial intermediaries in facilitating these CCP-enabled manipulation schemes. According to Bloomberg, D. Boral Capital underwrote over 30 IPOs of Chinese companies, of which 10 crashed in manipulation patterns. Bloomberg identified D. Boral among "just 8 underwriters that

helped take public nearly 75% of affected companies."6 SEC filings identify D. Boral as an underwriter for Chinese issuers, including PHH and MSGY, which have been associated with suspected manipulation.

75.    The Moolenaar-Khanna letter explained that a January 2026 enforcement action yielded information regarding the mechanics of the fraudulent scheme, stating the following, in pertinent part:

A January 2026 FINRA enforcement action against Boustead Securities and Sutter Securities has revealed the precise mechanics

34

of these CCP-enabled schemes, providing the Committee with a detailed roadmap of how PRC stock manipulation operates through U.S. underwriters:[8]

**"Nominee Account" Infrastructure:** Chinese issuers refer dozens of PRC nationals to open brokerage accounts en masse. FINRA documented cases where 10 PRC nationals submitted account forms with virtually identical information—same income ranges, same net worth, same investment objectives, and same risk tolerance—despite all claiming to be "unemployed by personal choice." These accounts are funded by undisclosed third parties and controlled by hidden PRC principals. Specific examples documented by FINRA include:

- A 22-year-old Chinese student with a claimed net worth of $300,000 who invested $2 million after the Chinese issuer's CEO communicated that "her father decided to increase" the investment;

- A 37-year-old unemployed PRC national with $0 reported net worth who invested $100,000;

- A 24-year-old unemployed PRC undergraduate student with no income who claimed $1.5 million net worth;

- An entity that attempted to invest $4.5-5 million despite having no bank account and a claimed net worth of only $150,000-$499,000.[9]

**Coordinated "Aftermarket Support" Manipulation:** FINRA found that underwriters encouraged Chinese issuers to have their referred customers provide "aftermarket support" by placing coordinated limit buy orders at prices above the IPO price. In one documented offering, 31 issuer-referred Chinese customers placed orders to purchase 374,518 shares at prices above the listing price on a single day, using virtually identical order language (orders at $5.50, $6.00, $6.50, and $7.50). This artificially inflates prices before insiders in the PRC dump their shares on American retail investors.[10]

**WeChat and WhatsApp Coordination:** PRC participants coordinated these schemes using WeChat and WhatsApp messaging applications, including discussions of wire transfers totaling millions of dollars. In one case, three unaffiliated individuals wired $5 million from the same Hong Kong bank to fund a single entity's investment in a Chinese IPO. Underwriters received screenshots of

35

WeChat conversations discussing allocations and wire transfers but failed to preserve or review these communications.[11]

**Clearing Firm Warnings Ignored:** One clearing firm, after identifying repeated red flags in Chinese account applications, told the underwriter: "At this time we think it is best to put a hold on opening any accounts for clients who reside in China. As discussed, based on what we have seen lately we are not comfortable with the flow of accounts coming in from China that appear to be related and the source of funds that would ultimately flow through [the clearing firm] in those accounts."[12]

The pattern across these schemes is striking: Chinese shell companies incorporated in the Cayman Islands are listed on NASDAQ through VIE structures that provide American investors no actual ownership in the underlying Chinese business. Hundreds of millions of shares are issued to anonymous insiders—often through the "nominee account" infrastructure documented by FINRA—immediately before coordinated social media campaigns drive retail investors to purchase the stock. When the price peaks, PRC insiders dump their shares in pre-market hours when ordinary Americans cannot trade, and the stock collapses 90-99% within hours.[13]

The CCP enables these schemes through four principal mechanisms: (1) refusing law enforcement cooperation with U.S. authorities investigating Chinese nationals; (2) harboring "pig butchering" scam centers that operate openly in China and CCP-aligned nations like Cambodia and Myanmar; (3) permitting VIE structures that allow Chinese companies to access U.S. capital markets while denying Americans any actual ownership; and (4) blocking Public Company Accounting Oversight Board (PCAOB) audit access that could expose fraudulent financials.[14]

FINRA has issued multiple warnings specifically about the risks of Chinese IPO fraud that underwriters were obligated to heed:

- **FINRA Regulatory Notice 21-03 (February 2021)** warned about "multiple new customers opening accounts (particularly if they reside overseas and communicate with the firm only through electronic means) who either deposit shares of the same issuer or were introduced by the same individual to the firm."[15]

- **FINRA's 2021 Report on Examination and Risk Monitoring** identified as an emerging risk that "certain foreign national and foreign entity nominee accounts appear

to have been opened solely to invest in the initial public offerings and subsequent aftermarket trading in one or more exchange-listed issuers based in restricted markets, such as China."[16]

- **FINRA Regulatory Notice 22-25 (November 2022)** warned of a "heightened threat of fraud" in connection with "small-cap IPOs involving issuers with primary operations in China or other foreign countries" and specifically identified "nominee accounts, primarily accounts opened for foreign nationals" as a key fraud indicator.[17] Given the documented methods of CCP-enabled manipulation and FINRA's findings, the Committee requests that D. Boral Securities provide complete and detailed responses and documents addressing the following questions no later than March 13, 2026. Absent a timely and complete response, the Committee will pursue compulsory process.

76.     Despite these developments, including those surrounding the Underwriter Defendant, Defendants were nonetheless silent regarding the realized risk to investors that the Company was the target of a market manipulation scheme.

### E.     The Truth Emerges as Megan Shares Are Dumped

77.     On March 25, 2026, after opening for trading at $4.82 per ordinary share, the Company's shares reached an intraday high of $5.18 per share before closing down sharply at $4.24 per ordinary share. In the final minutes of trading, the Company's shares declined 12.5% from $4.85 per share at 3:45 PM down to $4.24 per share at closing. There was no news or announcement regarding the Company at this time. On this date, in total, the Company's daily trading volume surged to 29,207,900.

78.     Notably, in addition to the significantly discounted shares distributed in connection with the Secondary Offering, March 25, 2026 represented the first day after the expiration of the 180-day IPO Lock-Up period. Although USSB, YHCML, ECGL, KLSB, KBSB, MSB, and SHSB

37

were subject to the IPO Lock-Up, there is no indication that these entities were parties to the Secondary Lock-Up.

79.    Following the sharp decline towards the close of trading on March 25, 2026, a coordinated "dump" of Megan shares occurred afterhours, which led to the stock opening on March 26, 2026, at just $0.423 per share on volume of approximately 6.8 million shares, a decline of 90% from the prior day's closing price. After the first minute of trading, NASDAQ halted trading Megan shares. Between 9:30 AM EST and 10:02:01 AM EST, Megan shares would be halted five different times, only reopening for brief windows of seconds and minutes. The Company's stock would be halted three more times throughout the day at 10:29:01 AM EST, 10:49:37 AM EST, and 11:10:58 AM EST. The Company's stock would close at just $0.28 per share on trading volume of 39,239,600.

80.    Weeks later, on April 14, 2026, the Company issued a press release, which confirmed that the Company's "directors, executive officers, shareholders holding 5% or more of its outstanding Class A Ordinary Shares or Class B Ordinary Shares, and certain other shareholders remain subject to lock-up agreements." Further, the Company reported that "recent updates by certain trading platforms to the Company's reported public float reflect information previously disclosed in connection with the Company's follow-on offering" and "[a]s of the date of this release, there has been no material increase in freely tradeable shares beyond previously disclosed levels." Moreover, the Company stated that it "believes the recent share price volatility may be attributable, in part, to market dynamics, including data updates across trading platforms and limited liquidity during after-hours trading" and declared that "[t]here has been no fundamental change in the Company's business, operations or financial conditions."

81.     Then, on April 30, 2026, Megan filed a Notification of Late Filing with the SEC related to its Form 20-F Annual Report. Therein, the Company stated, without further explanation, that it "is unable to file its Form 20-F for the fiscal year ended December 31, 2025, by the prescribed filing date because [the Company] requires additional time to complete its financial reporting and finalize the Form 20-F." The Notification of Late Filing was signed by Defendant Hoo. Megan ordinary shares closed at $0.173 per share on April 30, 2026.

82.     On May 13, 2026, the Company filed a Current Report on Form 6-K revealing receipt of a notification letter from NASDAQ, indicating that the Company was not in compliance with NASDAQ's minimum bid price requirement, and that the Company was granted a 180 calendar day grace period, expiring November 9, 2026, to regain compliance.

83.     On May 15, 2026, the Company filed its Annual Report on Form 20-F. Therein, the Company revealed that as of December 31, 2025, the Company's "disclosure controls and procedures were ineffective as our management has identified a material weakness that has been identified related to our lack of sufficient financial reporting and accounting personnel with appropriate knowledge of the generally accepted United States Generally Accepted Accounting Principles ('U.S. GAAP') and SEC reporting requirements to properly address complex U.S. GAAP accounting issues and to prepare and review our consolidated financial statements and related disclosures to fulfill U.S. GAAP and SEC financial reporting requirements. The other material weakness that has been identified related to our lack of comprehensive accounting policies and procedures manual in accordance with U.S. GAAP."

V.     **AUDITOR DEFENDANT ALLEGATIONS**

84.     The Auditor Defendant certified in the Prospectus and as part of the Registration Statement and reaffirmed in connection with the Secondary Offering that "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of

39

the company as of December 31, 2022, 2023, and 2024 and the results of its operations and cash

for each of the three-year period ended December 31, 2024 in conformity with the account

principles generally accepted in the United States of America ('U.S. GAAP')." Additionally, the

Auditor Defendant stated the following:

> Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

85.    In issuing its audit opinion on Megan's financial statements, the Auditor Defendant

failed to comply with U.S. Generally Accepted Accounting Principles ("GAAP") or the standards

of the Public Certified Accounting Oversight Board ("PCAOB") requirements. These standards

required the Auditor Defendant to exercise due professional care in the performance of the audit

and to obtain competent, sufficient evidentiary matter to form a basis for their opinion, and to

obtain reasonable assurances that the financial statements were free from material misstatement,

whether caused by error or fraud.

86.    In conducting its audits, the Auditor Defendant had access to the files and key

employees of the Company at all relevant times. The Auditor Defendant had continuous access to

and knowledge of the Company's confidential internal, corporate, financial, operating and

business information, and had the opportunity to observe and review Megan's business and

accounting practices, and to test the Company's internal accounting information and publicly

reported financial statements. Accordingly, the Auditor Defendant was aware of the significant

deficiencies at the Company. Thus, if the Auditor Defendant had complied with PCAOB standards,

40

it would have determined that there was no reasonable basis for its audit report because, among other things, the Auditor Defendant was aware of undisclosed facts tending to seriously undermine the accuracy of its audit report and conformity with GAAP and the Company's reported financial metrics.

## VI.    CLASS ACTION ALLEGATIONS

87.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that: (i) purchased or otherwise acquired Megan securities between September 26, 2025, and March 25, 2026, inclusive, and who were damaged thereby, and (ii) purchased or otherwise acquired Megan securities pursuant and/or traceable to the Offering Documents in connection with Megan's initial public offering ("IPO"), which occurred on or around September 26, 2025. Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which the Defendants have or had a controlling interest.

88.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Megan's shares actively traded on the NASDAQ. While the exact number of Class Members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Megan shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Megan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41

89.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

90.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

91.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Megan; and

c.      to what extent the members of the Class have sustained damages and the proper measure of damages.

92.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.    UNDISCLOSED ADVERSE FACTS

93.     The market for Megan securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and misleading statements and/or failures to disclose, Megan securities traded at artificially inflated prices during the Class Period. Plaintiff

42

and other members of the Class purchased or otherwise acquired Megan securities relying upon the integrity of the market price of the Company's securities and market information relating to Megan and have been damaged thereby.

94.    Throughout the Class Period, Defendants materially misled the investing public thereby inflating the price of Megan securities, by publicly issuing false and/or misleading statements and/or omitting to disclose the material facts necessary to make Defendants' statements, as set forth herein, not false or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Megan's business, operations and prospects as alleged herein.

95.    At all relevant times, the material misrepresentations and omissions particularized in the Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Company's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company, its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements and omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## VIII.    LOSS CAUSATION

96.    Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the economic loss suffered by Plaintiff and the Class.

43

97.     During the Class Period, Plaintiff and the Class purchased Megan's securities at artificially inflated prices and were damaged thereby. The price of Megan's securities significantly declined when the misrepresentations made to the market, and/or the information alleged to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## IX.     SCIENTER ALLEGATIONS

98.     As alleged herein, Defendants acted with scienter because Defendants: (1) knew or should have known that the public documents and statements issued or disseminated in the name of Megan were materially false and/or misleading; (2) knew or should have known that such statements or documents would be issued or disseminated to the investing public; and (3) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Megan, their control over, and/or receipt and/or modification of Megan's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

## X.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

99.     The market for Megan's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Megan's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying

44

upon the integrity of the market price of Megan's securities and market information relating to the Company and have been damaged thereby.

100. During the Class Period, the artificial inflation of Megan's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Megan's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Megan and its business, operations, and prospects, thus causing the price of Megan's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements and/or omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, and each of them has been damaged as a result.

101. At all relevant times, the market for Megan's securities was an efficient market for the following reasons, among others:

      a. Megan shares met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient and automated market; and/or

      b. Megan communicated with public investors through established market communication mechanisms, including through dissemination of press releases on national circuits of major newswire services and through other public disclosures.

102. As a result of the foregoing, the market for Megan securities promptly digested current information regarding Megan from all publicly available sources and reflected such

45

information in Megan's share price. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of Megan's securities at artificially inflated prices and a presumption of reliance applies.

103. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.   NO SAFE HARBOR

104. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in purportedly forward-looking statements, because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the

forward-looking statement was authorized or approved by an executive officer of Megan who knew that the statement was false when made.

## FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5(b)
Promulgated Thereunder Against Megan, the Individual Defendants, & the Auditor
Defendant**

105.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

106.   During the Class Period, Defendants Megan, the Individual Defendants, and the Auditor Defendant carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Megan securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants and each defendant, took the actions set forth herein.

107.   The identified Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Megan securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

108.   The identified Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Megan's financial well-being and prospects, as specified herein.

47

109.    The identified Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of the Company's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

110.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company or their business relationship in connection with the Company and its IPO, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, internal controls and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data information about the Company's finances, operations, and sales at all relevant times, and/or were required to perform reasonable due diligence in connection with the IPO; and (iv) each of these Defendants was aware of the Company's

dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

111. The identified Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Megan's true financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements and/or omissions regarding the Company's business, operations, financial well-being and prospects, and exposure to material, realized risks throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

112. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, set forth above, the market price of Megan securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and other members of the Class acquired Megan securities during the Class Period at artificially inflated prices and were damaged thereby.

49

113.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Megan was experiencing, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Megan securities, or, if they had acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

114.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

115.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM

**Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) & (c) for Fraud in Connection with the Sale or Purchase of a Security Against Megan, Individual Defendants, the Auditor Defendant, and the Underwriter Defendant**

116.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

117.    During the Class Period, Defendants Megan, the Individual Defendants, the Auditor Defendant, and the Underwriter Defendant,  directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly: (i) employed devices, schemes or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

50

118.    The Defendants identified in connection with this Claim employed devices, schemes and artifices to defraud and deceive Class Period purchasers of Megan securities by: (i) initiating, endorsing, executing and/or completing the IPO on Megan's behalf and permitting trading in Megan securities on a national securities exchange while knowing or acting in reckless disregard of the false statements and omissions regarding Megan's financial outlook, internal controls, and/or operations; (ii) initiating, endorsing, executing and/or completing the IPO on Megan's behalf and permitting trading in Megan securities on a national securities exchange while knowing or acting in reckless disregard to the fact that Megan was the target of a market manipulation and promotional scheme; and/or (iii) attempting to manufacture artificial inflation by triggering volatility trading via false and misleading statements.

119.    At the time, Plaintiff and other members of the Class were ignorant of the identified Defendants' deceptions. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the deceptive acts and schemes, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Megan securities, or, if they had acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

120.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder.

121.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## THIRD CLAIM

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

122.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

51

123.    The Individual Defendants acted as controlling persons within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the identified Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the entities that they control, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

124.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same.

125.    As set forth above, Megan, the Individual Defendants, the Underwriter Defendant, and the Auditor Defendant each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**FOURTH CLAIM**

**Violation of § 11 of the Securities Act Against Megan,
the Individual Defendants, and the Auditor Defendant**

126.    Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

127.    This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants identified above, and does not sound in fraud and does not allege fraudulent intent or scienter in connection therewith, which are not elements of a claim under § 11 of the Securities Act.

128.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements therein not misleading, and omitted to state material facts required to be stated therein.

129.    The identified Defendants are strictly liable to the Plaintiff and the Class for the misstatements and omissions.

130.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, without omission of any material facts, and were not misleading.

131.    By reason of the conduct alleged herein, each Defendant violated, or controlled a person who violated, § 11 of the Securities Act.

132.    Plaintiff acquired Megan ordinary shares pursuant to the Registration Statement.

133.    Plaintiff and the Class have sustained damages. The value of Megan ordinary shares declined substantially subsequent to the IPO and indeed, have been halted from trading indefinitely as a result of Defendants' violations.

134.    At the time of their purchases of Megan ordinary shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based, to the time that this action commenced. Less than three years have elapsed between the time the securities upon which this Cause of Action is brought were offered to the public and the time that this action was commenced.

### FIFTH CLAIM

#### Violation of § 12(a)(2) of the Securities
#### Act Against Megan, the Individual Defendants, and the Auditor Defendant

135.    Plaintiff repeats and re-alleges each and every allegation contained above, as if set forth herein.

136.    This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) on behalf of the Class, against all Defendants.

137.    By means of the defective prospectus, the identified Defendants promoted, solicited and sold Megan ordinary shares to Plaintiff and other members of the Class.

138.    The Prospectus for the IPO contained untrue statements of material fact, and concealed and omitted material facts, as detailed above. Defendants owed Plaintiff and the other Class members, who purchased Megan ordinary shares pursuant to the prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated, in order to make the statements therein not misleading. Defendants, in exercising reasonable care, should have known of the misstatements and omissions contained in the prospectus, as set forth above.

54

139.    Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known of the untruths and omissions contained in the prospectus at the time Plaintiff acquired Megan ordinary shares.

140.    By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiff and the other Class members who purchased Megan ordinary shares pursuant to the prospectus, sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and other Class Members who hold Megan ordinary shares pursuant to the prospectus, have the right to rescind and recover the consideration paid for their shares, and hereby tender their ordinary shares to Defendants sued herein. Class members who have sold their ordinary shares seek damages to the extent permitted by law.

## SIXTH CLAIM

### Violation of § 15 of the Securities Act Against Megan and the Individual Defendants

141.    Plaintiff repeats and re-alleges each and every allegation contained above, as if set forth fully herein.

142.    This Cause of Action is brought pursuant to § 15 of the Securities Act against Megan and the Individual Defendants.

143.    The Individual Defendants were controlling persons of Megan, within the meaning of the Securities Act. By virtue of their positions as directors or senior officers of Megan, as alleged above, these Defendants each had the power to influence, and exercised the same, over the Company to cause it to engage in the conduct complained of herein. The Company controlled the Individual Defendants and all Megan employees.

144. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors, officers and major shareholders of Megan. Megan and the Individual Defendants were culpable participants in the violations of §§ 11 and 12(a)(2) of the Securities Act alleged in the Fourth and Fifth Causes of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## XII.   PRAYER FOR RELIEF

145. WHEREFORE, Plaintiff prays for relief and judgment, as follows:

    a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

    b. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    c. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    d. Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

146. Plaintiff hereby demands a trial by jury.

Dated: July 7, 2026

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

/s/ Patrick Donovan
Matthew M. Guiney
Patrick Donovan
Rourke Donahue
270 Madison Avenue

New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
guiney@whafh.com
donovan@whafh.com
donahue@whafh.com

57

## PLAINTIFF'S CERTIFICATION

**Wade Mundy** ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorizes the filing of a securities class action lawsuit.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in **Megan Holdings Limited** during the Class Period specified in the Complaint are as follows:

### SEE ATTACHED SCHEDULE A

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve nor served as a representative party for a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed

6/29/2026

_____ .

Signed by:

7DA7ADF122B545D...

**Wade Mundy**

**Schedule A to Certification of Wade Mundy**

**Megan Holdings Limited**

**Purchases**

| Date | Number of Shares | Price per Share | |
|------|------------------|-----------------|--|
| March 25, 2026 | 46,875 | $4.80 | Account 1 |
| March 25, 2026 | 19,000 | $4.80 | Account 2 |